**Deborah Sullivan v. SSA**                    CV-00-476-B    12/07/01

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>**Deborah Sullivan**</u>

    **v.**                                          **Civil No. 00-476-B**
                                              Opinion No. 2001 DNH 221

<u>**William A. Halter, Acting**</u>
<u>**Commissioner, Social Security**</u>
<u>**Administration**</u>

<u>**MEMORANDUM AND ORDER**</u>


Deborah Sullivan applied for Title II Social Security Disability Insurance Benefits and Title XVI Supplemental Security Income on March 3, 1998. Sullivan alleged an inability to work since December 1, 1997, due to nummular dermatitis, high blood pressure, hearing loss and depression. The Social Security Administration ("SSA") denied her application initially and on reconsideration. Administrative Law Judge ("ALJ") Thomas Fallon held a hearing on Sullivan's claim on February 11, 1999. In a decision dated May 28, 1999, the ALJ found that Sullivan was not disabled. On August 11, 2000, the Appeals Council denied Sullivan's request for review of the hearing decision, rendering

the ALJ's decision the final decision of the Commissioner of the SSA.

Sullivan brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the denial of her application for benefits. Sullivan requests that this court reverse the Commissioner's decision and award her benefits. For the reasons set forth below, I conclude that the ALJ's decision is supported by substantial evidence. Therefore, I affirm the Commissioner's decision and deny Sullivan's motion to reverse.

## I. FACTS[1]

Sullivan was fifty years old when she applied for benefits. She has a high school education, and has worked as a waitress, a convenience store cashier, a third-party billing clerk, and, most recently, a mail clerk at the VA hospital from November 1997 until a year and a half later, when her contract expired. Tr.[2] at 39-41, 50, 125, 132, 137. Sullivan has not worked since

---

[1] Unless otherwise noted, I take the following facts from the Joint Statement of Material Facts submitted by the parties.

[2] "Tr." refers to the certified transcript of the record submitted to the Court by the SSA in connection with this case.

leaving her job at the VA hospital, and asserts that she could not now work because of her depression and skin condition. Tr. at 42.

Sullivan has suffered from depression since her mother died in 1997. Tr. at 47-48. Her depression prevents her from doing some normal day to day tasks, such as grocery shopping on her own. Tr. at 56-57, 143. Sullivan also has been diagnosed with asthma, which is not severe but could become so if she does not stop smoking, and has hearing difficulty, but can hear when she wears hearing aides. Tr. at 49, 62. Finally, Sullivan has suffered from skin disorders including dermatitis and nummular eczema.

## A. Depression

Sullivan testified that her depression began with her mother's death. Tr. at 47-48. On December 22, 1997, Dr. Mitch Young saw Sullivan for follow-up of her depression, which he described as situational grief reaction. Dr. Young had previously prescribed Zoloft for Sullivan, but noted on her December 22 visit that she had stopped taking it because she became mentally disoriented. Tr. at 169. On December 29, 1997,

Sullivan wanted to restart taking Zoloft.  When Dr. Young saw Sullivan on April 13, 1998, for her eczema, he noted that she was having some stress and anxiety problems with her children.  Tr. at 178.

In May 1998, Dr. Young saw Sullivan for a follow-up on her hypertension and noted that she was depressed.  Tr. at 179.  Dr. Young saw Sullivan again the following month for menopause and depression, and prescribed menopausal medication that he thought might help with her depression.

On June 1, 1998, Dr. William Jamieson conducted a psychological evaluation of Sullivan, who showed some anxiety but no indications of a thought disorder.  Sullivan explained that she had been depressed for about six months, commencing with her mother's death, and indicated that she did not want to go anywhere or do anything, had not seen friends since January, cried easily and frequently, and had difficulty concentrating.  Sullivan told Dr. Jamieson that she sometimes had trouble falling asleep, but that she sometimes slept through much of the day.  Tr. at 215.  Dr. Jamieson diagnosed Sullivan as having major depression disorder and a history of alcohol abuse that was

currently in remission, but ruled out an anxiety disorder.

In June 1998, Dr. Michael Schneider, based on medical evidence in the record, prepared a psychiatric review technique form (PRTF) and a mental functional capacity assessment. Dr. Schneider's evaluation reflected that Sullivan had an affective disorder that caused a slight restriction of her daily living activities; moderate difficulties in social functioning; and deficiencies of concentration, persistence or pace, leading to failure in timely completion of tasks. Tr. at 221, 225. According to Dr. Schneider, this meant that Sullivan's ability to understand, remember, and carry out detailed instructions would be moderately limited, as would her ability to maintain attention and concentration for extended periods; respond to changes in the work setting; and accept instructions and respond to criticism from supervisors. However, Dr. Schneider also concluded that Sullivan had no significant limitations in other areas such as understanding; remembering and carrying out short, simple instructions; working with others without distraction; working without special supervision; getting along with others; and maintaining socially appropriate behavior. Tr. at 208-09, 212.

-5-

Under Dr. Young's supervision, Sullivan began taking Prozac in July 1998. In August 1998, Dr. Young noted that the Prozac was having some positive effect, but also diagnosed anxiety depression exacerbated by the recent loss of Sullivan's brother to cancer. He opined that continuing Prozac would be appropriate. Tr. at 186. The next month, on September 9, Dr. Young saw Sullivan again for her depression and noted that she continued to be anxious and depressed, unmotivated and was hesitant to go out and do things. Dr. Young decided to prescribe Diazepam in addition to her other medications.

On September 15, 1998, Sullivan cut her wrist with a kitchen knife. Treatment was minimal, requiring only a band-aid, and Dr. James Trapnell characterized the action as a suicidal gesture rather than a suicide attempt. Tr. at 191. The next day, Sullivan reported feeling very depressed and at risk for harming herself. On September 17, 1998, Dr. Trapnell saw Sullivan and gave her referrals for counseling after she requested treatment to avoid alcohol. On that day, Sullivan denied having suicidal ideation and said that she was not certain why she had cut her wrist.

Sullivan agreed to admit herself to the Catholic Medical Center psychiatric unit,[3] and Dr. Trapnell gave her an increased dosage of Prozac, and prescribed Vistaril. Tr. at 191. Shortly thereafter, on September 24, Dr. Trapnell observed that the Vistaril appeared to make Sullivan more anxious, stated that he would stop it, and gave her a three-week supply of BuSpar. Tr. at 192. At that time, Dr. Trapnell observed that Sullivan was tearful and edgy and continued to have some difficulties with life's day-to-day activities, although for the most part she was able to care for herself.

Dr. Trapnell completed a mental impairment questionnaire concerning Sullivan's functioning. Tr. at 247-250. As part of the questionnaire, Dr. Trapnell rated Sullivan's Global Assessment of Functioning (GAF) at 40 as of September 28, 1998, and as no higher than 45 in the preceding year. A GAF rating between 31 and 40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. A GAF rating between 41 and 50 indicates serious symptoms or serious

_____

[3]The record does not reflect that Sullivan ever did so.

impairment in social, occupational, or school functioning. For both categories, a higher rating in the range implies a less severe condition. Despite some success with Prozac, Dr. Trapnell predicted that Sullivan's impairment or treatment would cause work absence more than three times a month, and difficulty working at a regular job on a sustained basis (mostly due to poor concentration and emotional instability).

On October 8, 1998, Dr. Trapnell saw Sullivan and reported that she had been feeling much better and was on the verge of enrolling in outpatient psychotherapy through Greater Manchester Mental Health. Tr. at 195.

A month later, Dr. Loring Matthews, a licensed clinical psychologist, performed a psychological evaluation of Sullivan. Tr. at 234-38. Dr. Matthews opined that Sullivan's attention and concentration were below average, her long-term memory was in the average range, and her short-term memory was in the low average range. Tr. at 235. At the time, Sullivan reported being independent in day-to-day tasks, except for grocery shopping, which she performed while accompanied by someone. Tr. at 236.

Dr. Matthews diagnosed Sullivan with having a major depressive disorder, single episode, moderate. Tr. at 238. He

predicted that Sullivan's social interactions would be appropriate, although somewhat limited due to her withdrawal from others and fear of crowds, but that she might respond to stressful situations in an inappropriate manner. He opined that she would have some difficulty completing tasks that require her to focus her attention for long periods of time and require her to leave home. He recommended outpatient counseling, and predicted that with medication and adequate counseling, Sullivan would be able to return to work in six to twelve months.

## B. Asthma/Lung Condition

In May 1997, Dr. Young saw Sullivan and noted that her chronic obstructive pulmonary disease is aggravated by smoking, but that there were no inspiratory or expiratory wheezes or rhonchi in her lungs. Tr. at 165. A July 1997 examination of her lungs was negative. Tr. at 166.

## C. Hearing Loss

In February 1997, testing showed that Sullivan had moderate to moderate-severe mixed hearing loss, better on the right side than on the left. Tr. at 159, 161. She was subsequently supplied with hearing aids, which allow her to hear. Tr. at 62.

## D.  Skin Disorders

Sullivan went to the Manchester Community Health Center (MCHC) in February 1997 for follow up of mild solar keratosis, a premalignant warty lesion occurring on the sun-exposed skin of the face and hands, and a scattered rash on her back that was likely a residual from a reaction to medication.  Tr. at 162. Treatment for the rash was hydrocortisone cream.  In May 1997, Sullivan saw Dr. Young, who noted that she had mild solar keratosis.

In September 1997, Dr. Young saw Sullivan again and noted that her solar keratosis had improved since cryotherapy given in July.  Tr. at 167.  He also observed that she had recently broken out in pruritic, round skin lesions on the back of her neck and arm, and gave her Triamcinolone ointment, a topical corticosteroid, to treat them.

On January 5, 1998, Sullivan saw Dr. F. William Danby, who examined her dermatitis and diagnosed nummular eczema.  Tr. at 198.  He believed that Sullivan had a secondary infection of the discoid patches, and that the topical steroid tended to spread the infection.  Dr. Danby prescribed Keflex, a brand of

-10-

cephalexin, for the infection, as well as Triamcinolone for the dermatosis. Tr. at 198, 242.

On January 26, 1998, Sullivan saw Dr. Young for a follow-up. Dr. Young noted that Sullivan's nummular eczema was being treated with moisture, oral antibiotics and an ointment, and that her work environment is very dry. He noted that Sullivan would take three months off from work as part of her treatment plan.

In April 1998, Dr. Burton Nault reviewed medical evidence and prepared an assessment of Sullivan's ability to perform physical, work-related tasks. Tr. at 88-90, 199-207. In Dr. Nault's opinion, Sullivan had no exertional, postural, or manipulative limitations. He did recommend, though, that she avoid dry environments and wear cotton clothing. Tr. at 203, 205. Later, Dr. Robert Rainie agreed that Dr. Nault's opinion regarding Sullivan's abilities was consistent with flares of her intermittent dermatitis. Tr. at 199.

## II. <u>STANDARD OF REVIEW</u>

After a final determination by the Commissioner denying a claimant's application for benefits, and upon timely request by

the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicts in the evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Id. (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35

(1st Cir. 1999) (per curiam).  I apply this standard in reviewing the issues that Sullivan raises on appeal.

## III. <u>DISCUSSION</u>

The Social Security Act (the "Act") defines "disability" for purposes of both Title II and Title XVI as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act directs an ALJ to apply a five-step sequential analysis to determine whether a claimant is disabled.[4]  <u>See</u> 20 C.F.R. § 404.1520.  At step four, the ALJ must determine whether the claimant's impairment prevents her from performing her past work.  <u>See</u> <u>id.</u> § 404.1520(e).  To

---

[4]  In applying the five-step sequential analysis, the ALJ is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work.  <u>See</u> 20 C.F.R. § 404.1520 (2000).

make this determination, the ALJ must assess both the claimant's residual functional capacity ("RFC"), that is, what the claimant can do despite her impairments, and the demands of the claimant's prior employment. See id.; 20 C.F.R. § 404.1545(a); see also Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991) (per curiam). The claimant, however, bears the burden of showing that she does not have the RFC to perform her past relevant work. See Santiago, 944 F.2d at 5.

At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam). The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

In this case, the ALJ concluded at step four of the sequential evaluation process that Sullivan's impairment does not

prevent her from performing her past work as a mail clerk.  Tr. at 28.  The ALJ determined that Sullivan retains the RFC "to perform the nonexertional requirements of work which involves simple job instructions that does not involve extensive contact with the public, with a moderate limitation in the ability to maintain attention and concentration, and no exposure to dust, fumes or other chemical irritants."  Tr. at 28.  The ALJ considered Sullivan's educational background, age and RFC when he decided that Sullivan could perform her past relevant work.

Sullivan argues that the ALJ's decision was tainted by a number of legal errors.  First, Sullivan asserts that the ALJ erred in deciding that she could perform her past relevant work as a mail clerk.  She complains that the ALJ's decision lacks findings pertinent to the specific demands of a mail room clerk position, and argues that the ALJ failed to find that her prior work environment involved no exposure to environmental irritants that might aggravate her asthma.  Second, Sullivan argues that the ALJ erred in declining to credit her alleged functional limitations and restrictions.  Finally, Sullivan asserts that the ALJ erred by not giving her treating source's opinion appropriate weight.  I address each of these arguments in turn.

-15-

**A.   The ALJ's Decision at Step Four That Sullivan
         Could Perform Her Past Relevant Work**

Sullivan contends that the ALJ's decision at step four of the evaluation process was flawed because he did not base his decision on enough information.  She argues that the ALJ failed to comply with SSR 82-62 by failing to make a finding of fact regarding the physical and mental demands of her past occupation.  Sullivan argues that in this case, such a finding was essential because the ALJ also found that she had certain limitations.  Without such a finding, Sullivan contends, one is left to guess whether the physical and mental demands of a mail room clerk position are compatible with her exertional limitations.

The government argues, and Sullivan agrees, that an ALJ is permitted to rely upon the Dictionary of Occupational Titles (DOT) in order to make a finding concerning the physical and mental requirements of a job, and that the ALJ in this case did so.  However, Sullivan asserts that the ALJ needed to state explicitly his opinion of the physical and mental demands of a mail room clerk position in order to conclude properly that the demands were consistent with Sullivan's limitations.

Specifically, the ALJ should have confirmed that a mailroom clerk position entails the need to comprehend and follow simple job instructions, does not require extensive contact with the public, and would not cause exposure to dust, fumes and other chemical irritants.

I agree that the ALJ was entitled to rely upon the DOT, and did so in order to make a finding regarding the requirements of a mail room clerk position. The DOT includes a detailed description of a mail room clerk position, from which it is apparent that the position requires medium to low aptitude ability, and a level of interaction with others that is "not significant." See Dictionary of Occupational Titles at § 209.687-026. The DOT also includes the amount of exposure to environmental conditions faced by a mail room clerk, and concludes that there is no exposure to toxic, caustic chemicals or other environmental conditions. See id. In view of the record evidence and the job description in the DOT, the ALJ reasonably concluded that the physical and mental requirements for a mail room clerk position were compatible with Sullivan's limitations.

-17-

**B.**   **The ALJ's Decision Not to Credit Fully Sullivan's**
         **Alleged Functional Limitations and Restrictions**

Sullivan argues that the ALJ did not properly analyze the factors outlined in Avery v. Secretary of Health and Human Services before he determined that her subjective allegations were not credible.  See 797 F.2d 19, 29-30 (1st Cir. 1986). Specifically, Sullivan alleges that the ALJ erred in finding (1) that her psychological disability was not as serious as she claimed because only two of her seven medications were prescribed for her mental impairment; (2) that her complaints of dizziness as a side effect from the Clonidine she took could be resolved by reducing the amount of the medication; (3) that her suicide gesture was less serious than she claimed; and (4) that she had overstated her inability to care for her house.  In a similar vein, Sullivan contends that the ALJ misconstrued Dr. Trapnell's opinion that she was able to care for herself.  Tr. at 26.

1.   Standards Governing an ALJ's Credibility Determination

The SSA regulations require that the ALJ consider a claimant's symptoms, including complaints of pain, when he is determining whether a claimant is disabled.  See 20 C.F.R. §

-18-

404.1529(a).[5]  The ALJ must evaluate the intensity, persistence, and functionally limiting effects of the claimant's symptoms so that the ALJ can determine how the claimant's symptoms limit his or her capacity for work.  See id. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186, at *1 (1996).  The ALJ must consider all of the available evidence, including the claimant's medical history, the medical signs and laboratory findings, the claimant's prior work record, and statements from the claimant, the claimant's treating or examining physician or psychologist, or other persons about how the claimant's symptoms affect her.  20 C.F.R. § 404.1529(c)(1)-(3).

_____

[5]  An ALJ must apply a two-step analysis to evaluate a claimant's subjective complaints.  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that can reasonably be expected to produce pain or other symptoms alleged.  See 20 C.F.R. § 404.1529(b); Da Rosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986) (per curiam).  Then, if such an impairment exists, the ALJ must evaluate the intensity and persistence of the claimant's symptoms.  See 20 C.F.R. § 404.1529(c).  The ALJ made a specific finding regarding the first step of the analysis, determining that Sullivan "has documented impairments of depression, anxiety, asthma and hearing loss, which limit her ability to perform basic work activities."  Tr. at 21.  Sullivan does not take issue with this determination.  Therefore, I focus on the second step of the analysis.

The Commissioner recognizes that symptoms may suggest a more severe impairment "than can be shown by objective medical evidence alone." Id. § 404.1529(c)(3). Accordingly, the ALJ must evaluate the claimant's complaints in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate his symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his symptoms; (6) any measures the claimant uses or has used to relieve symptoms; and (7) other factors concerning the claimant's limitations and restrictions due to pain or other symptoms. Id. § 404.1529(c)(3)(i)-(vii); see also Avery, 797 F.2d at 29-30. These factors are sometimes called the "Avery factors." In addition to considering these factors, the ALJ is entitled to observe the claimant, evaluate her demeanor, and consider how the claimant's testimony fits with the rest of the evidence. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

In assessing the credibility of a claimant's subjective complaints, the ALJ must consider whether these complaints are consistent with the objective medical evidence and other evidence in the record.  See 20 C.F.R. § 404.1529(a).  While a claimant's complaints of pain must be consistent with the medical evidence to be credited, they need not be precisely corroborated with such evidence.  See Dupuis v. Sec'y of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989) (per curiam).  When making a credibility determination, the ALJ must also make specific findings as to the relevant evidence he considered in deciding whether to believe a claimant's subjective complaints.  Da Rosa, 803 F.2d at 26.

2.  The ALJ's Assessment of Sullivan's Subjective Allegations

Contrary to Sullivan's argument, the ALJ properly analyzed the Avery factors and made sufficient findings as to the relevant evidence he considered in deciding not to credit her subjective allegations about her functional limitations and restrictions. The ALJ heard considerable testimony regarding these factors at the hearing on February 11, 1999.  Tr. at 37-79.  He considered the evidence concerning all the Avery factors when he determined that Sullivan could perform her past relevant work.  Tr. at 27-

-21-

28. Substantial evidence exists in the record to support his conclusion that Sullivan has some limitations, but that these limitations do not preclude her from performing all work. At this point, I will address Sullivan's allegations regarding her subjective complaints individually.

### a. The ALJ's Observation That Only Two of Her Seven Medications Were for Psychological Impairment

In his findings, ALJ Fallon stated, "the claimant, through her attorney, argued that her impairments were basically psychological in nature. Yet, of the seven medications the claimant currently takes, only Buspar and Prozac are prescribed for her mental impairment." Tr. at 26. Sullivan argues that the ALJ erred in suggesting that the number of different medications she took made a difference in the severity of her mental impairment. She states that the important fact is that her mental impairment was severe enough to require medication. I agree with Sullivan that the number of different medications a person is prescribed does not in itself reflect the severity of an ailment. However, the record contains substantial evidence upon which the ALJ could have concluded that Sullivan's mental impairment did not preclude her from working. For example, the

evidence reflects that Sullivan was able to perform most activities of daily living ("ADLs"). Tr. at 24-25. The ALJ found that the medical evidence concerning Sullivan's depression and anxiety supported the conclusion that her impairments were likely the result of situational grief, and that she has been responsive to treatment. Tr. at 23. Because this assessment is supported by substantial evidence in the record, I find that the ALJ's statement regarding the number of medications Sullivan took for her mental impairments does not constitute reversible error.

### b. Sullivan's Complaints of Dizziness as A Side Effect of Her Medication

Sullivan argues that the ALJ did not properly take into account her complaints of dizziness that she experienced from the medication Clonidine that she took. The ALJ considered Sullivan's complaint of this side effect as required by Avery and 20 C.F.R. § 404.1529(c)(3)(iv). However, he discounted the seriousness of the complaint because the record reflects that when she complained of the side effect, her doctor reduced the dosage. The fact that her doctor might later have increased the dosage does not mean that the ALJ improperly evaluated Sullivan's subjective complaint of dizziness. Instead, it can be inferred

-23-

that ALJ Fallon concluded that if Sullivan was once again experiencing dizziness as a side effect of her medication, she could again go to her doctor for an adjustment in the dosage.

c.     Sullivan's Assertion That ALJ Fallon Improperly Discounted Her Subjective Testimony of Suicidal Thoughts

Sullivan testified at the February 11, 1999 hearing that she had attempted suicide in September 1998.  Tr. at 51.  However, there is substantial evidence in the record to support the conclusion that Sullivan had not intended to commit suicide, but instead had made a suicidal gesture.  Tr. at 191, 192, 195. Therefore, the ALJ did not err when he declined to apply more weight to Sullivan's testimony than to that reflected by the medical evidence.

d.     Sullivan's Assertion That the ALJ Erred In Finding That She Is Capable of Caring for Herself

Sullivan complains that the ALJ misinterpreted a statement she made at the hearing about painting her house.  She states that he found a contradiction in that she said her apartment was a mess, but that she had tried to paint it.  Instead, Sullivan says that her actual testimony at the hearing was that she wanted

to paint her apartment, but that she had not attempted to do so. Sullivan implicitly asserts that, if the ALJ had credited her actual statement, he would have made a different finding about her ability to perform her daily activities. Sullivan's argument is without merit.

The record contains substantial evidence to support the ALJ's conclusion that Sullivan was capable of taking care of herself to a large extent. Tr. at 236. She attends to her personal hygiene and grooming, prepares her meals, does all household tasks including paying bills, and shops when someone accompanies her. Tr. at 143-45, 236. A misunderstanding regarding whether Sullivan tried to paint her apartment does not undermine the ALJ's finding on this point.

### e. The ALJ's Reliance on Dr. Trapnell's Statement That Sullivan Could Take Care of Herself to a Large Extent

Sullivan similarly asserts that the ALJ erred in relying on her treating physician's statement that she could care for herself to a large extent. Sullivan points out that Dr. Trapnell qualified that statement with the assertion that she continued "to have some difficulties, however, with fulfilling some of

life's basic ADLs including proper nutrition." Tr. at 192. As noted above, the record contains substantial evidence that Sullivan is capable of performing life's basic ADLs to a large extent, and the ALJ did not err in finding so.

In sum, the ALJ properly considered Sullivan's subjective testimony. He credited her testimony where he found it credible, and rejected it where he found it to be against the weight of the medical evidence. Avery requires that an ALJ consider a complainant's subjective testimony, but it does not require that an ALJ rely upon subjective testimony where it conflicts with medical evidence. See 797 F.2d at 21.

## C. The ALJ's Weighing of Dr. Trapnell's Opinion

Sullivan argues that the ALJ did not give appropriate weight to the opinions of her treating source, Dr. Trapnell. She argues that the ALJ gave minimal attention to the following medical opinions of Dr. Trapnell: that Sullivan suffered from major depression; that her condition would cause her to be absent from work more than three times a month and prevent her from working at a regular job on a sustained basis; that she was moderately impaired in ADLs; that she was moderately impaired in social

functioning; and that she would experience deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner. Sullivan asserts that the ALJ essentially dismissed Dr. Trapnell's opinion because he wrote in an October 1998 report that she "had been doing much better." Tr. at 22.

An ALJ must give controlling weight to the medical opinion of a treating physician where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). When a treating physician's medical opinion is not entitled to controlling weight, the ALJ must still determine the appropriate weight to give to the opinion by evaluating certain factors. See id. The ALJ must consider: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) whether and to what extent the opinion is supported by medical signs and laboratory findings; (iv) whether the opinion is consistent with other evidence in the record; (v) whether the physician's opinion

concerns medical issues related to his area of specialty; and (vi) any other factors which support or contradict the opinion. Id. § 404.1527(d)(2)-(d)(6).

The ALJ considered Dr. Trapnell's opinions and agreed with them to a large extent. Tr. at 19-28. The ALJ found that Sullivan suffers from depression and anxiety. Tr. at 27. However, the ALJ disagreed with Dr. Trapnell regarding the seriousness of this depression and anxiety. He explained that he "does not agree with Dr. Trapnell that the claimant would experience moderate restrictions in both her daily activities and social functioning as a result of her depression and anxiety. The Administrative Law Judge finds the claimant's depression and anxiety would result in only slight restrictions in daily activities and slight difficulties in maintaining social functioning." Tr. at 24. There is substantial evidence in the record to support this finding.

The record indicates that Sullivan was able to perform most ADLs, and had assistance when she needed it, such as with grocery shopping and driving. Tr. at 143-45, 236. Although Sullivan reported sleeping late into the afternoon, the ALJ noted that she

also testified to taking Vistaril, a medication prescribed to help her sleep, in the morning. Tr. at 63-64. The ALJ also relied upon the opinions of two other doctors who had evaluated Sullivan. Tr. at 25. Dr. Matthews had reported that Sullivan's social interactions would most likely be appropriate, although limited because her recent losses had caused her to withdraw from others and become fearful of crowds. Tr. at 25. Dr. Jamieson also reported that Sullivan had "no difficulty relating appropriately." Tr. at 25.

There is no evidence that the ALJ unjustifiably discounted Dr. Trapnell's opinions. He considered them, and when he disagreed, explained his reasoning and the alternative evidence upon which he relied. Tr. at 24-25. The ALJ concluded that Sullivan does suffer from depression and anxiety, and that there should be some limitations to the type of work she does. Specifically, he found that she is limited to work that requires following only simple job instructions, that does not require extensive contact with the public, and that provides a work environments free from dust, fumes and other chemical irritants. Tr. at 26. Substantial evidence supports each of these findings.

## IV. <u>CONCLUSION</u>

Because I have determined that the ALJ's denial of Sullivan's application for benefits is supported by substantial evidence, I affirm the Commissioner's decision. Accordingly, Sullivan's motion to reverse (Doc. No. 5) is denied, and defendant's motion for an order affirming the Decision of the Commissioner (Doc. No. 7) is granted. The Clerk shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

December 7, 2001

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.